## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-207 (TNM)** |
| **MATTHEW ROSS COUNCIL,** | |
| **Defendant.** | |

### GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Matthew Ross Council to thirty months' incarceration—which is in the middle of the advisory Guidelines' range of twenty-seven to thirty-three months, which the government submits is the correct Guidelines calculation—along with three years of supervised release, $2,000 in restitution, and the combined total mandatory special assessment fee of $300.

### I.    INTRODUCTION

The defendant, Matthew Ross Council, participated in the January 6, 2021, attack on the United States Capitol. This violent attack forced an interruption of the certification of the 2020 Electoral College vote, threatened the peaceful transfer of power after the 2020 Presidential Election, injured more than one hundred law enforcement officers, and resulted in more than 2.8 million dollars in losses.[1]

Council traveled from Florida to Washington, D.C., because he believed that the former

---

[1] As of October 17, 2022, the approximate losses suffered because of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

President was going to "expose everything" and he did not want to miss his "last speech."[2] After the former President's speech, Council became increasingly agitated and violent, making his way first to the West Lawn and West Plaza—where he was sprayed with a chemical irritant—before making his way up to the NW Plaza and into the Capitol. It was in the Capitol that Council engaged in an act of violence against federal police officers. Specifically, Council, a former college football player, lowered his head, stuck out his arms, and rammed into a line of police officers, pushing them back. After ramming into the police officers, Council fell to the ground and police arrested him. Since January 6, 2021, Council has continued to embrace conspiracy theories, advertise himself as a political prisoner, and support others in their defiance of the government.

A thirty-month sentence is sufficient, but not greater than necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant. The government's recommendation also reflects the defendant's admission of guilt.

## II.   FACTUAL BACKGROUND

### A. Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds

Assaults against law enforcement on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible. Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak

---

[2]     https://rumble.com/vr0obj-sovereign-souls-ep.-016-feat.-j6-defendant-matthew-council.html (at approx 3 min. 9 sec.); *see also* https://americangulag.org/they-have-pushed-medicine-on-me-and-abuse-me-in-the-facilities-and-jail-because-of-what-i-believe-j6-defendant-matt-council-shares-his-tragic-story/. The interview between an individual that calls themselves JoanUp (who is never seen) and Matthew Council is approximately 52 minutes long. As of the filing of this memorandum, the video has been viewed approximately 23,400 times.

for their actions, each blow helped the crowd penetrate further into the United States Capitol Police's ("USCP") defenses until the building itself was accessible and the occupants were at risk. The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



***FIGURE 1:*** *Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction and @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds. At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, which led to the Pennsylvania Walkway. Seeing this, a half dozen USCP officers began to gather behind what is labeled in Government's Exhibit 1 as

"1st Police Barricade," circled in red and marked as Area A. At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the restricted area to engage with USCP officers at the first manned barrier. Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob. By 12:58, the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B on Government's Exhibit 1. They flooded the area labeled "Lower West Plaza," Area C on Government's Exhibit 1, pushing against the barricade there.



***FIGURE 2:*** *Stills from USCP security footage showing the progression of the crowd from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza. For the next

hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles, pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



**FIGURE 3:** *The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left). In the photo of the nearly completed bicycle rack barrier line as of 1:39 p.m., a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol. At 2:03 p.m., Metropolitan Police Department officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd. It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately. This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left. On the contrary, the mob in the restricted area continued to grow as crowds streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

After having actively defended their line for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles. Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves. By 2:28 p.m., with their situation untenable and openings in the perimeter having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called. With their defensive lines extinguished, several police officers were surrounded by the crowd. The rioters had seized control of the West Plaza and the inauguration stage. There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.

## B.  Injuries and Property Damage Caused by the Attack

The D.C. Circuit has observed that "the violent breach of the Capitol on January 6 was a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). Members of this Court have similarly described it as "a singular and chilling event in U.S. history, raising legitimate concern about the security—not only of the Capitol building—but of our

democracy itself." *United States v. Cua*, No. 21-CR-107 (RDM), 2021 WL 918255, at *3 (D.D.C. Mar. 10, 2021) (Moss, J.); *see also United States v. Foy*, 21-CR-108 (TSC), ECF No. 41, Hrg. Tr., p. 14 (D.D.C. June 30, 2021) (Chutkan, J.) ("This is not rhetorical flourish. This reflects the concern of my colleagues and myself for what we view as an incredibly dangerous and disturbing attack on a free electoral system."); *United States v. Chrestman*, 535 F. Supp. 3d 14, 25 (D.D.C. 2021) ("The actions of this violent mob, particularly those members who breached police lines and gained entry to the Capitol, are reprehensible as offenses against morality, civic virtue, and the rule of law.") (Howell, C.J.).

In addition, the rioters injured more than a hundred members of law enforcement.[3] Some rioters wore tactical gear, wielded dangerous weapons, and deployed chemical irritants during hours-long hand-to-hand combat with law enforcement officers.[4] Moreover, the rioters inflicted significant mental and emotional injuries on law enforcement officers and others on scene that day who feared for their safety.[5]

The rioters stole, vandalized, and destroyed property inside and outside the U.S. Capitol Building. They caused extensive, and in some instances, incalculable, losses. This included wrecked platforms, broken glass and doors, graffiti, damaged and stolen sound systems and

---

[3] For additional description of officer injuries, s*ee* Staff of Senate Committees on Homeland Security and Governmental Affairs and on Rules and Administration Report, Examining the Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6 (June 7, 2021), p. 29, *available at* https://www.hsgac.senate.gov/imo/media/doc/HSGAC&RulesFull Report_ExaminingU.S.CapitolAttack.pdf.

[4] *Id*. at 27-30.

[5] *Id*.; *see also* Architect of the Capitol, J. Brett Blanton, Statement before the House of Representatives Committee on House Administration (May 19, 2021), *available at* https://www.aoc.gov/sites/default/files/2021-05/AOC_Testimony_CHA_Hearing-2021-05-19.pdf (describing the stress suffered by Architect of the Capitol employees due to the January 6, 2021, attack).

photography equipment, broken furniture, damaged artwork, including statues and murals, historic lanterns ripped from the ground, and paint tracked over historic stone balustrades and Capitol Building hallways.[6] The attack resulted in substantial damage to the U.S. Capitol, resulting in losses of more than 2.7 million dollars.

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[6] *Id*.; *see also* United States House of Representatives Curator Farar Elliott, Statement Before the House Appropriations Subcommittee on the Legislative Branch (Feb. 24, 2021), *available at* https://docs.house.gov/meetings/AP/AP24/20210224/111233/HHRG-117-AP24-Wstate-ElliottF-20210224.pdf (describing damage to marble and granite statues).

### C.  Council's Role in the Attack on the Capitol

*Approach to the Capitol*

Council gave a recorded video interview to an individual known as JoanUp that was posted to the website Rumble[7] on December 18, 2021.[8] According to the defendant, Council was "very excited" to travel from his home state of Florida to Washington, D.C., on January 6, 2021, to attend former President Trump's speech. Council believed that the former President was going to "expose everything" and "reveal the evidence" at that rally, but also did not want to miss his last speech, "if that, in fact, was the case." According to his statements in the video, Council was not expecting much out of Vice President Pence because when he was a governor, "he had the most ties of any governor to China."

As Council was listening to the former President, Council realized that this speech was "almost exactly like most of the other speeches [the former President] gave at rallies." When while listening to his speech, Council realized that Trump probably was not going to be re-elected, "It just really disappointed me that that didn't happen, especially since I was running my mouth around the crowd with everybody, you know, contradicting them because they all didn't think it was going to happen." By that time in the day, Council's brother had returned to their hotel room. Accordingly, Council "walked over to the Capitol on [his] own."

While walking from the Ellipse to the Capitol, Council thought that he saw individuals that were from other "liberal" groups. Council recalled,

> On the way to the Capitol, there was people running out saying, "Oh they're attacking us, they're attacking us," which turns out to have been plants. I had started

---

[7] Rumble is an online video platform and cloud services business headquartered in Longboat Key, Florida and Toronto, Ontario. *See* https://www.google.com/search?q=rumble+website; www.rumble.com.

[8] Unless otherwise specified, all quotations are from a video interview that Council gave to an individual known as JoanUp that was published to Rumble on December 18, 2021. *See* fn. 2, supra.

running at one point to go help. You know, I wasn't going to let my fellow patriots be attacked by anybody, really. If it's going to go down, it's going to go down now, is basically what I was thinking in my mind.

Council stopped running because he felt like what was being said "wasn't accurate" and was "some kind of a prank," but he nonetheless kept walking with the crowd to the Capitol. Council recalled being "very active" in the protest. Council spoke about being "maced three times."

### Council on the West Plaza

Council followed a common path to the Capitol, approaching from the west. Once he got to the steps that lead from the West Lawn up to the Upper West Terrace and the Senate Wing Door area of the Capitol, Council "saw blood on the ground, tear gas flying, and all that." Council was then "under the assumption that [the rioters] had been attacked and were retaliating." By the time he got there, Council claimed that the barricades were down. Council also recalled, "there was blood on the ground, all the Trump supporters were up on the stairs with other people standing around."

While speaking with JoanUp, Council recalled that at an unspecified time, he went to a "kind-of a station where they poured milk and water in your eyes to clear you up *so you could go back in*" (emphasis added). Council also incorrectly asserted, "None of the Trump supporters were doing that [tearing down barricades]. They were holding a line. Speaking their thoughts. But they weren't trying to tear barricades down. They weren't looking for an open confrontation with the Capitol police." Council's statements are clearly contradicted by video and photographic evidence.[9]

---

[9] https://youtu.be/gTurnetBh4A?t=557.







***IMAGES 1a, 1b, 1c:*** *Council puts on a hat, pushes a barricade aside, and walks towards a line of police officers even as one officer directs Council to move back. A police officer then deploys a chemical irritant directly into Council's eyes. These are screenshots from 9 min. 18 sec., 9 min. 23 sec., and 9 min. 30 sec. in the YouTube video cited in fn. 9.*

A police officer sprayed Council in the face with what appears to be, based on Council's reaction, a chemical irritant.





**IMAGES 1d, 2a (top to bottom):** *Council reacts to the chemical irritant that was sprayed in his eyes. The screenshot on the top is from 9 min. 34 sec. in the YouTube video cited in fn. 9. The bottom photograph[10] appears to show the same moment.*

---

[10] https://www.gettyimages.com/detail/news-photo/trump-supporter-screams-towards-policeand-security-forces-news-photo/1230457787.





***IMAGES 2b, 2c (top to bottom):*** *Council reacts to the chemical irritant that was sprayed in his eyes. These photographs[11, 12] appear to show the same moment as Image 1d and 2a.*

---

[11]     https://www.gettyimages.com/detail/news-photo/trump-supporters-clash-with-police-and-security-forces-as-news-photo/1230454383.

[12]     https://www.gettyimages.com/detail/news-photo/trump-supporters-clash-with-police-and-security-forces-as-news-photo/1230454879.

Council reacted visibly and severely to being sprayed in the face with a chemical irritant. Council did not, however, turn back, seek medical attention, or walk away from the conflict. He could have easily left the Capitol Grounds and gone back to rejoin his brother in their hotel room. Instead, Council continued forward, pushing deeper into the conflict, making his way up to and eventually inside the U.S. Capitol itself.

To understand why Council would do this, again, Council's own words are informative. He recounted the events of January 6, 2021, to an individual that calls himself Pastor Greg.[13]  The mood of the crowd, according to Council, was "disappointment." Council was convinced that Trump would present

> evidence of the fraud that would just blow it away and make the narrative be so strong towards the fraudulent election that Pence would have no choice but to at least delay the certification of the election. And that did not happen. So, my walk towards the Capitol was, as were many, dissatisfied with what happened that day. It was more like one of his regular rallies with a little bit of a twist of election fraud and go protest, so uh, and then when you get to the Capitol and people that are just standing there praying [or] getting shot with tear gas there's a big pool of blood on the ground and people are getting hit with mace that are just eating granola bars that it quickly turns into what you saw.

The videos from that same time at that same location show rioters repeatedly pushing against police lines, throwing poles and metal barricades onto their heads, and subjecting them to constant verbal and physical attacks as chaos reigns around them.[14]  Turning back to the Sovereign Souls interview, Council recalled that when he saw

> the blood and everything and saw what was going on and the tear gas flying at people that were just standing there, it pissed me off. And I started calling for people to follow me, and saying, "Let's go expletive expletive! Let's go! Come on! They're not doing this to us! This is it! I've had it! You know, I was rallying the

---

[13]    https://www.spreaker.com/user/chosengenerationradio/pastor-greg-chosen-generation-radio-j6-e

[14]   *See*, ex., https://ia804509.us.archive.org/26/items/6bupkHSRBXH5FbPnR/Capital_March_the_truth_1.mpeg4, beginning at about 2 min. 30 sec., where rioters can be heard yelling at police officers, "Fuck you! Fucking traitors! Be a fucking patriot! Do your fucking job!

troops to go up into the area where all of the real protesting was going on where there were still barricades off to the right. And there was scaffolding, and there were people throwing bricks and rocks at the Capitol Police. And I made my way up onto that and told them to stop, that's not why we're here. We're not here to injure any of these police officers. We're not here to hurt anybody. We're here to go in and confront the cheating liars. And I was a little bigger at the time. They listened to me, or they were going to get one of those bricks shoved up their you-know-what.

The screenshot below, taken from 4 min. 11 sec. of the video cited to in fn. 14, shows a moment when Council returned to the line of police officers to confront them once again. He is no longer wearing the TRUMP hat that can be seen in Images 1d and 2a. He is, however, now wearing protective eyewear.

 

*IMAGE 3a, 3b (l to r):* *Council confronts police officers again after previously being   repelled with a chemical irritant. The screenshot on the left is from 4 min. 11 sec. in the publicly available video cited in fn. 14. The image on the right is a cropped version of the screenshot to show a closer view of Council.*

Although it is no longer publicly available, an image from a Twitter user whose handle is known to the FBI shows Council, this time with no hat and no glasses, being physically held back by a police officer on the West Plaza.



**IMAGE 4:** *Council confronts police officers on the West Plaza.*

Another pair of photos taken at that location show police officers pointing a device directly at Council's face while spraying.





*IMAGES 5a, 5b (top to bottom): Two publicly available images that show a moment when Council approached the police officers on the West Plaza and had to be sprayed with a chemical irritant to get him to move back.*

In his statement to JoanUp, Council's mission "was to change the narrative." He believed that there was an attempt to make everyone be violent and to make the Trump supporters "look like something that they were not."

In his comments to Pastor Greg, Council elaborated on this idea that January 6 was both justified and a plot by Democratic leadership to make Trump supporters look bad.

That was Nancy Pelosi's plan. That was the coordinated effort by the government. They had to take the steam out of the pressure 'cause the digital soldiers—and I'm a digital soldier—the digital soldiers amongst them and the "Q" community had been putting a lot of pressure on Pence and, uh, he was leaning in that direction, and there were Congressmen that had evidence, but because of the event, because of their insurrection, the steam was taken out of it, so Pence wasn't going to delay anything. He had to certify it to maintain political capital for his future, which unfortunately in the politics game you gotta be selfish sometimes. But that was the whole goal. That was the plan.

Council went on to call Nancy Pelosi's plan,

[B]rilliant because she could make all Trump supporters look crazy so that when they start talking about the evidence that was coming out in droves nobody listens. And the main people that were willing to fight for the Constitution are silenced by

From the West Plaza, Council went up the Northwest staircase to the Northwest Plaza. The plaza is an open area with a door on the east side that leads to a north-south running hallway on the first floor of the Capitol and a fire door on the plaza's north side that leads to a hallway with Senate offices, including the Senate Parliamentarian's office. United States Capitol Police (USCP) Closed Circuit Video (CCV) shows Council making his way up the NW staircase at approximately 2:29 p.m.

 

*IMAGES 6a, 6b (l to r): USCP CCV shows Council ascending the NW staircase amidst a large group of rioters at approx. 2:29 p.m.[15]*

---

[15] Times shown in USCP CCV screenshots is in Coordinated Universal Time (UTC), which on

Once he reached the top of the staircase, Council made his way to the Northwest Plaza, a location where many other rioters had gathered.



**IMAGE 7:** *This screenshot from USCP CCV shows how after Council reached the top of the NW staircase, he made his way across the NW Terrace towards the NW Plaza amidst a large group of rioters.*

---

January 6 was five hours ahead of Eastern Standard Time. For example, the UTC time 19:29:20 is equal to EST 14:29:20 which is equal to 2:29:20 p.m. (EST).

### *Council in the NW Plaza*

Earlier in the day, the rioters' initial breach into the U.S. Capitol was through the Senate Wing Door and the two windows flanking it. By approximately 2:27 p.m., USCP officers had stopped the flow of rioters into the Capitol through that breach point. By the time Council arrived in the Northwest Plaza, it was "before it was opened, and it hadn't been opened yet." A publicly available video shows Council making his way through the crowd up to the Senate Wing Door as the crowd chanted "U-S-A! U-S-A!"[16]



**IMAGE 8:** *In this screenshot from a publicly available video, Council pushes his way east across the NW Plaza towards the Senate Wing Door, the first breach point of the U.S. Capitol that at this time had been sealed off.*

Council mentioned to JoanUp that he recalled seeing a "wide open window." He got up close to the window and saw the police officers "standing way back away from the window doing nothing." He did not climb in through the window because he did not want to climb through a window, and "he was not that excited about going inside."

---

[16]     https://ia904507.us.archive.org/15/items/DCRyx6RmiZGFRfQ9Y/FB_20210106_143942.mpeg4 (at approx. 10 min. 55 sec.).

 

*IMAGES 9a, 9b (l to r):* *In this screenshot from USCP CCV, at approximately 2:38 p.m., Council appeared at the broken-out window just north of the breach point known as the Senate Wing Door. There is no sound on the CCV, but Council is animated and appeared to be yelling at the USCP officers inside.*

Contrary to Council's representation, the officers inside were not "doing nothing." At least three can be seen in USCP CCV engaging with rioters at the north Senate Wing Door Window. Four other officers constructed a barricade out of wooden displays with printed information on the top that until January 6, 2021, served only as a decorative furnishing and not as a substitute for a portcullis. More than a dozen other USCP officers were attempting to herd the rioters out of the Capitol and others stood by for support. As can be seen by comparing Images 4 and 5a, the rioters just outside the Senate Wing Door far outnumbered the police officers inside, and both sides knew it.

While the surveillance video has no sound, Council seems to be energized and erratic in his movements, in turn beating his chest, pointing to the inside of the Capitol, and waving others forward. At the same time, unseen individuals at the broken-out Senate Wing Door were by turns spraying an unknown substance through the shattered window and training what appears to be a high-lumen spotlight into the faces of the police officers attempting to keep the rioters out.





**IMAGES 10a, 10b (top to bottom):** *At approximately 2:39 p.m., Council is still at the broken-out window just north of the breach point known as the Senate Wing Door. Unseen individuals spray an unknown aerosol agent through a broken window of the Senate Wing Door, and a second later, a high intensity spotlight is directed at police officers through the same window.*

Council remained in the window, striking his fist against the pane, for about two minutes. At a certain point, he appeared to negatively react to something (perhaps the unidentified aerosol agent deployed in Image 5a and 5b). Council covered his face and departed, walking west. As he walked away, Council pointed behind him towards the broken-out window and told others to, "Go!

Go!"[17] Council did not get far, though, as the steps up to the breach point known as the Parliamentarian's Door are on the north side of the NW Plaza, and just a few yards west from the Senate Wing Door.



**IMAGE 11:** *At approximately 2:40 p.m., Council leaves the broken-out window and walks west. This screenshot is from approx. 4 min. in a publicly available video (fn. 17).*

---

[17] https://jan6archive.com/vimeo/500245716.mp4.

### *Council Entered the Capitol and Assaults Police Officers*

Council told JoanUp that to get through the Parliamentarian's Door, he had to use his size and strength to force the door open, but while he was holding it open, various "clean cut" and "articulate" but unidentified "instigators" in ski masks crawled between his legs to get inside. He also claimed that he did not film or record anything because he was too active throughout the day. Both of these claims are contradicted by video and photo evidence.[18, 19]

 

*IMAGES 12, 13 (l to r): Council walks through the recently breached Parliamentarian's Door while holding up a digital device in a manner that appears to be consistent with recording or taking pictures. The photograph on the left is from a publicly available Facebook page (fn. 18) and the screenshot on the right is from a publicly available video (fn. 19).*

Once inside, Council claimed to have seen an office that the rioters were "ransacking." Council claimed to have cleared the rioters out of the office and to have admonished them. Council claimed that those inside the office were not Trump supporters, even though several individuals

---

[18]    https://www.facebook.com/photo.php?fbid=10164694238140483&set=pb.776265482.-2207520000..&type=3.

[19]    https://archive.org/download/bSMrPJFjub5DiQMaa/20210106_144341.mpeg4   (at   approx. 00:16).

who are known to have been inside the Parliamentarian's office have already pleaded guilty or been convicted at trial.





*IMAGES 14, 15 (top to bottom): USCP CCV shows Council walking through the recently breached Parliamentarian's Door at 2:44 p.m. while holding up a digital device in a manner that appears to be consistent with recording video or taking pictures.*

Council maintained that he had no intention to or interest in entering the Capitol. But Image 15 appears to show Council smiling broadly as he finally made his way inside. Once inside,

surveillance video shows Council walking by an office, but there is no evidence that he cleared anyone out. Council also claimed to have encountered a young couple with a stolen laptop and told them, "If you're going to keep [the laptop], go to your car and go home. But they're going to find you." Council further recalled that other rioters "were as angry as I was. But no matter how angry you are, we back the blue. We're not here to hurt police officers. We never were." Soon after Council entered the Capitol through the Parliamentarian's Door, he decided that it was, in fact, permissible to attack the blue.

According to Council, someone identified him as the leader and called him to the front. When he saw the crowd, "it gave me chills. The whole hallway was full of Trump supporters with American flags and Trump flags, and they were all just standing there behind me."



**IMAGE 16:** *A screenshot from a publicly available video (fn. 17 at approx 10 min. 46 sec.) shows the hallway—specifically the Brumidi Corridors—"full of Trump supporters with American flags and Trump flags."*

Council claimed to have not entered any of the offices but recalled having been in the hallway for fewer than five minutes. Council recalled that when he was in the front, there was a

line of Capitol police officers. Council indicated that he spoke with the officers and stated, "Look, we just want to go talk to the cheatin' liars in there. Join us, we're not here for you, we're not here to hurt you. We're just trying to speak our peace before our country is changed forever." After he realized that the officers were not going to move, Council looked to his left and to his right to see if he had any support. Finding none, Council then "went down like this, put my head down, and I pushed four Capitol police officers back maybe fifty feet, and at that point they started to arrest me. Nobody followed. [ . . . ] I didn't hurt anybody."

A photographer captured rioters fighting the line of USCP officers Council referenced moments before Council arrived and attacked.[20] [21]



**IMAGE 17:** *A publicly available photograph that shows the line of USCP officers that Matthew Council admitted to ramming into and pushing back. The photograph shows a USCP officer spraying the rioters with a chemical irritant.*

---

[20]    https://www.gettyimages.com/detail/news-photo/police-spray-supporters-of-us-president-donald-trump-as-news-photo/1230455896

[21] No USCP CCV is available for Council's attack on police officers because it occurred in an area without any CCV coverage.



*IMAGES 18a, 18b: Two screenshots from a publicly available interview between Council and a media personality that calls themselves JoanUp. (fn. 2 at approx. 25 min. 00 sec.) Council is demonstrating the position he assumed before ramming into the line of police officers, claiming to have pushed four of them back fifty feet.*

When speaking about his assault of the police officers, Council's recalled that his intent was:

> to make way for the Trump supporters to get through to go talk. [ . . . ] Like you would do in any other protest that you see. Those people are trying to push, you know, they're trying to get through the line to go talk to whoever it is that they feel is doing the injustice. And normally when those kinds of things happen, like what happens later on, and I'll explain, the police officer knows who really wants to hurt him and who doesn't and they lower the charges and you get misdemeanors and they end up getting dropped and it's a protest. And you know, you're fightin' the good fight. You know what I mean? So, that was my intent.

When the officers came to arrest Council, "I stuck my arms straight out to the sides, up in the air, and said I'm not, you know, that's it. And they realized quickly that I was just going to go along with them. I had done what I was going to do, and that was it." USCP officers arrested Council, processed him, and released him. Council returned home to Florida with his brother the next day.

Since January 6, 2021, Council has continued to be active on social media, often repeating his belief that he is one of the persecuted "J6ers" and that the events of that day were a setup to hide a stolen election. He continues to be an outspoken advocate of overthrowing the current

government, as was exemplified in his many postings in support of the so-called Trucker's Convoy. In one video, he tells anyone watching that he recently found out "that I'm goin' to prison no matter what, and my only hope is the Trucker's Convoy, which may or may not push for the January 6'ers. I mean, they've got their own agenda."[22]  In another post, Council clarified what he thought their agenda was as follows:[23]

> Good morning, truckers! Matt Council, a.k.a. CookiePuss1776 here. I'm just gettin' on here to pray for you guys again. I've been praying for the truckers in the convoy and the truckers that are going on strike. This is going to be unprecedented, biblical in scale. And it's gonna bring the tyrants to their knees in Jesus' name, I just know it.

Council included the hashtags #gotruckersgo and #freethej6ers in this post.

## III.     THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Council with Civil Disorder in violation of 18 U.S.C. § 231(a)(3); Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1); Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1); Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2); Disorderly Conduct in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(D); and Parading, Demonstrating, or Picketing in a Capitol Building in violation of 40 U.S.C. § 5104(e)(2)(G).

On August 10, 2022, Council pled guilty to each count of the six-count indictment without entering into a plea agreement with the government. The parties submitted to the Court a joint Statement of Offenses wherein Council admitted to sufficient facts for the Court to adjudge him guilty of all the charged offenses. ECF No. 55. On August 11, 2022, the Court entered an Order

---

[22] https://gettr.com/post/prsu9q5701 (dated February 1, 2022)

[23] https://gettr.com/post/px6leq8fa8 (dated February 27, 2022)

directing the government "to file a table comparing the sentences requested and the sentences imposed for certain crimes charged in this case." ECF No. 57. Assistant U.S. Attorney and Chief of the Capitol Siege Section, John Crabb, Jr., entered an appearance on behalf of the United States and filed a response to the Court's order. In that response, Chief Crabb provided the requested data or explained its absence. Chief Crabb requested and the Court granted a modification of the Order. ECF Nos. 58-59, 61.

## IV.   STATUTORY PENALTIES

Council now faces sentencing on each of the counts of conviction identified above.   As noted at the Change of Plea Hearing, the Court informed Council, and Council recognized that he faces a term of imprisonment of up to five years, a term of supervised release of up to three years, a fine of up to $250,000, and a mandatory $100 special assessment fee for pleading guilty to 18 U.S.C. § 231(a)(3); a term of imprisonment of up to eight years, a term of supervised release of up to three years, a fine of up to $250,000, and a mandatory $100 special assessment fee for pleading guilty to 18 U.S.C. § 111(a)(1); a term of imprisonment of up to one year, a term of supervised release of up to one year, a fine of up to $100,000, and a mandatory $25 special assessment fee for pleading guilty to 18 U.S.C. § 1752(a)(1); a term of imprisonment of up to one year, a term of supervised release of up to one year, a fine of up to $100,000, and a mandatory $25 special assessment fee for pleading guilty to 18 U.S.C. § 1752(a)(2); a term of imprisonment of up to six months, a term of probation of up to five years, a fine of up to $5,000, and a mandatory $25 special assessment fee for pleading guilty to 40 U.S.C. § 5104(e)(2)(D); and a term of imprisonment of up to six months, a term of probation of up to five years, a fine of up to $5,000, and a mandatory $25 special assessment fee for pleading guilty to 40 U.S.C. 5104(e)(2)(G).

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The revised PSR does not include a Guidelines analysis for all Counts—Counts One through Six—to which the defendant pleaded guilty. *See* Draft PSR ¶¶ 38-63. USSG §1B.1(a)(1)-(3) describes the steps a sentencing court must follow to determine the Guidelines range for each count, which includes determining the applicable Guidelines, determining the base offense level, applying appropriate special offense characteristics, and applying any applicable Chapter 3 adjustments. Under USSG §1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count." Only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3. The revised PSR does not follow these steps. It concludes (*see* PSR ¶¶ 49-52) that Counts One through Four group—a conclusion with which the government agrees—but does not set forth the Guidelines calculation separated for each count as required under U.S.S.G. § 1B1.1(a)(4). That Guidelines analysis follows:

### Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §2A2.4(b)(1)(a) | Offense Involved Physical Contact | +3 |
| | | |
| U.S.S.G. §2A2.4(c)(1) | Cross Reference[24] | |
| U.S.S.G. §2A2.2(a) | Base Offense Level (adjusted) | 14 |
| U.S.S.G. §3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

### Count Two: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2A2.2(a) | Base Offense Level | 14 |
| U.S.S.G. §3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

### Count Three: 18 U.S.C. § 1752(a)(1)

| | | |
|---|---|---|
| U.S.S.G. §2B2.3(a) | Base Offense Level | 4 |
| U.S.S.G. §2B2.3(b)(1)(A) | Trespass at Restricted Building | +2 |
| | | |
| U.S.S.G. §2B2.3(c)(1) | Cross Reference[25] | |
| U.S.S.G. §2X1.1(a) | Base Offense Level (adjusted)[26] | 14 |
| | **Total** | **14** |

### Count Four: 18 U.S.C. § 1752(a)(2)

| | | |
|---|---|---|
| U.S.S.G. §2A2.4(a) | Base Offense Level | 10 |
| U.S.S.G. §2A2.4(b)(1)(a) | Offense Involved Physical Contact | +3 |
| | **Total** | **13** |

---

[24] "If the conduct constituted aggravated assault, apply §2A2.2 (Aggravated Assault)." Under §2A2.2, Application Note 1, "'Aggravated assault' means a felonious assault that involved [ . . . ] (D) an intent to commit another felony."

[25] "If the offense was committed with the intent to commit a felony offense, apply §2X1.1 in respect to that felony offense, if the resulting offense level is greater than that determined above."

[26] "The base offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."

### Counts Five and Six: 40 U.S.C. §§ 5104(e)(2)(D) and (G)

|  | Pursuant to U.S.S.G. §1B1.9, the Guidelines do not apply | N/A |

### Multiple Counts

#### *Group One*[27]

| U.S.S.G. §3D1.2(b) | Combined Offense Level | 20 |

#### *Group Two*[28]

| U.S.S.G. §3D1.2(a) | Combined Offense Level | 14 |

#### *Grouping Analysis*

| U.S.S.G. §3D1.4 | Total Number of Units | 1 ½ |
|  | Increase in Offense Level | +1 |

|  | **Total** | **21** |

### Acceptance of Responsibility

| U.S.S.G. §3E1.1(a) | Acceptance of Responsibility | -2 |
| U.S.S.G. §3E1.1(b) | Upon Motion of the Government | -1 |

### Adjusted Offense Level

|  | **Total** | **18** |

The Draft PSR correctly recognizes that pursuant to USSG §2B2.3(c)(1), the calculation should cross reference a felony offense, but the draft PSR uses 18 U.S.C. § 1512(c)(2), a crime that is not charged on the superseding Indictment. PSR ¶ 47. The government recommends instead using 18 U.S.C. § 231(a)(3) since the trespass was most directly in furtherance of Council's obstruction of law enforcement during a civil disorder.

---

[27] Counts One and Two group together because the counts involved the same victim, that is, the same group of police officers, and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan.

[28] Counts Three and Four group together because the counts involve the same victim (Congress) and the same act or transaction.

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 66. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, after acceptance of responsibility, at 18, Council's Guidelines imprisonment range is 27 to 33 months' imprisonment.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

As in all cases, the enumerated 18 U.S.C. § 3553(a). Some of the factors this Court must consider include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). Each of the 3553(a) factors in this case weighs in favor of a lengthy term of incarceration.

### A.  Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021, is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, each individual person who entered the Capitol and assaulted law enforcement on January 6 did so under extreme circumstances. The unique conduct of everyone directly contributed to the whole. Each person who entered the Capitol would at a minimum have had to cross numerous barriers and barricades, hear the mob, and smell chemical irritants in the air. Depending on the timing and location of their approach, in addition to their own acts of violence, each rioter likely observed

other fighting with law enforcement and acts of or calls for violence.

While looking at the defendant's individual conduct, this Court should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged any acts of property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored, law enforcement; and (9) whether the defendant otherwise exhibited evidence of remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each individual defendant on a spectrum as to their fair and just punishment.

The nature and circumstances of this defendant's crimes weigh heavily towards a significant term of incarceration.

Council went to the front of the West Plaza, made his way to the police line, and despite being sprayed with a chemical irritant on the first encounter, he went back to the police on two additional occasions. Council made his way from the chaotic West Plaza to another conflict-heavy zone, the Northwest Plaza and Senate Wing Door. Less than an hour prior to his arrival, the Capitol had been breached at that location by the first rioters to fight their way up to that point. The wounds of the Capitol were still fresh, and the rioters were relentless, attacking with chemical irritant of their own and high-powered lights, all while chanting, "Let us in! Let us in!" Council was there for it. He was at there at a broken-out window, gesturing at police officers and encouraging other rioters to move forward.

Council finally found his way inside the Capitol via the Parliamentarian's Door. When a

police line formed in front of him, Council used brute force to assault law enforcement. Council's fell and immediately became vulnerable to apprehension and arrest by the police. While he has been consistent in his expression of remorse for assaulting police, he has continued in his belief that tyrants remain in power, lending his voice and status as a "digital warrior" to other efforts that purport to overthrow the tyrants and "save the J6'ers."

Council's actions on January 6 show an absolute disregard for the rule of law coupled with a willingness to incite and engage in violence. His actions show a willingness to violate the law, to engage in acts of disorder and violence, and to harm others, including uniformed law enforcement.

After the riot, Council has celebrated and defended the actions of the rioters, consistently accusing other individuals of entrapping him and other rioters and accusing them of orchestrating the whole affair.

While Council has expressed some recognition that attacking police was wrong, Council performed a cost-benefit analysis during the heat of battle on January 6 and decided that all things considered, it was worth it to attack the police officers so that he and those that were with him could get to the lawmakers, betting (incorrectly) that the prosecutors would plead it out to a misdemeanor or drop the charges. The seriousness of this offense including Council's entry into the U.S. Capitol during the breach, his participation in and incitement of mob violence, his direct confrontation of police officers on the West Plaza, at the Senate Wing Door, and in the Brumidi Corridors, and his assault on a uniformed police officer, demand a lengthy sentence of imprisonment.

### B. The History and Characteristics of the Defendant

The defendant has two troubling arrests and numerous violations of the terms of his pretrial release. The recommended sentence is sufficient but not greater than necessary to meet the

sentencing goals of the U.S. Sentencing Commission:

- In 1991, at the age of 19, Council was charged with destruction of property for smashing the rear window of a resident assistant's car while in a drunken anger. Draft PSR ¶ 68. Council pled no contest to the charges.

- In June 2021, Council was charged with domestic battery of an elderly (over the age of 65) victim, Council's father. Draft PSR ¶ 69. The charges were dropped by the local prosecutors when the victim made it clear that he would not cooperate.

- Pretrial services filed reports of noncompliance on July 27, 2021, as well as on November 12, 16, and 30, 2021. Draft PSR ¶ 10. During the period of noncompliance that led to the November 16 report, Council barricaded himself in a hotel room, refused to come out, and caused thousands of dollars of damage. The level of danger to the public and private property was such that a local police response was required.

- Pretrial services filed reports of noncompliance on March 16, 23, and April 6, 2022. Draft PSR ¶ 11. The reports voice concerns regarding Council's mental health and violent tendencies.

The defendant's crimes on January 6 were not an isolated event in an otherwise law-abiding life. Council's arrests and actions while under conditions of pretrial release demonstrate a concerning propensity towards substance abuse and violence.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[29] As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Council's criminal conduct, entering the U.S.

---

[29] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021) (hereinafter "FBI Director Wray's Statement"), available                                                                                              at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20Testimony.pdf

Capitol without permission or authority to disrupt lawful proceedings and assaulting a law enforcement officer, is the epitome of disrespect for the law. When Council entered the Capitol grounds and the Capitol itself, it was abundantly clear to him that the lawmakers and the police officers protecting them were under siege. Police officers were overwhelmed, outnumbered, and— in some cases—in danger. As shown above, the protestors that filled the Northwest Plaza far outnumbered the USCP officers who were attempting to keep them out. The rule of law was not only disrespected; it was under attack that day. A lesser sentence would suggest to the public, in general, and other rioters, specifically, that attempts to obstruct official proceedings and assaults on police officers are not taken seriously. In this way, a lesser sentence could encourage further abuses. *See Gall*, 552 U.S. at 54 (it is a "legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law").

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[30] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. The violence at the Capitol on January 6 was cultivated to and

---

[30] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

did interfere with one of the most important democratic processes we have: the transfer of power.

As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70.

The gravity of these offenses demands deterrence. This was not a protest. *See id.* at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights."). And it is important to convey to future rioters and would-be mob participants—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to Council also weighs heavily in favor of a lengthy term of incarceration. First, although the defendant has a criminal history category of I, his history of arrest and the number of pretrial violation reports filed against him show a clear pattern of aggressive and violent behavior. Second, although the defendant has expressed remorse and contrition, his social media statements after January 6 are those of a man girding for another battle and seeking to overthrow the current government. Council's own prayer that the trucker's convoy would bring the tyrants to their knees and his continued belief that he is being politically persecuted demonstrates that Council's sentence must be sufficient to provide

specific deterrence from committing future crimes of violence, particularly considering his history of violent assault and rhetoric.

### E.  The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise,'" and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108. Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101. As the Third Circuit has stressed:

> The Sentencing Guidelines are based on the United States Sentencing Commission's in-depth research into prior sentences, presentence investigations, probation and parole office statistics, and other data. U.S.S.G. §1A1.1, intro, comment 3. More importantly, the Guidelines reflect Congress's determination of potential punishments, as set forth in statutes, and Congress's on-going approval of Guidelines sentencing, through oversight of the Guidelines revision process. See 28 U.S.C. § 994(p) (providing for Congressional oversight of amendments to the Guidelines). Because the Guidelines reflect the collected wisdom of various institutions, they deserve careful consideration in each case. Because they have been produced at Congress's direction, they cannot be ignored.

*United States v. Goff*, 501 F.3d 250, 257 (3d Cir. 2005). "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable

one." *Rita*, 551 U.S. at 347 (emphasis in original). In other words, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough*, 552 U.S. at 89.

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. To reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines will be a powerful driver of consistency and fairness moving forward.

### F.  Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct".   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[31]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").

Although all the other defendants discussed below participated in the Capitol Riot on

---

[31] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

### *Cases Arising Out of the January 6, 2021, Capitol Riot*

As of the date of this sentencing memorandum, several felony Capitol Riot defendants have been sentenced. The case of *United States v. Kevin Douglas Creek* (21-CR-645 (DLF)) may be useful to the Court in its consideration of a sentence for Council. In *Creek*, the defendant is a business owner and former United States Marine who joined the crowd of rioters facing off with police officers on the West Plaza of the Capitol on January 6. While there, Creek attacked two police officers while they were retreating, a crime to which he plead guilty via a plea agreement with the government. 21-CR-645 (DLF), ECF No. 48, pp. 19-20. To the government's knowledge, Creek did not continue up towards the Capitol or enter the U.S. Capitol on January 6. Like Council, Creek did not show meaningful remorse between the time of his sentence. The government recommended that Creek serve twenty-seven months, which was the mid-range of the Guidelines as calculated and agreed upon by the parties. A mid-Guidelines sentence in this case would be thirty months incarceration, which is the sentence that the government is recommending for Council. Accordingly, the instant recommendation does not constitute an unwarranted sentencing disparity.

More recently, is the case of *United States v. Ricky C. Willden* (21-CR-423 (RC)). Willden self-identifies as a Proud Boy who travelled all the way from California to enter the U.S. Capitol and attack police officers. Willden approached the Capitol from the east, climbing the East front stairs and gathering with other rioters just outside the East Rotunda Doors. While there, he used a chemical irritant to spray at least six police officers. Willden entered the Capitol for approximately

fifteen minutes. After leaving, Willden posted to social media, "I think they got the message from everyone of all ages" and "FYI the cop who started this shit by mazing [sic] me and hitting my nuts playing stupid games, hope you enjoyed my special prizes." Willden's assault on police also appeared to have a degree of premeditation, as evidenced by the fact that he brought a can of chemical irritant and goggles to the Capitol. Willden requested to plead guilty pursuant to a plea agreement, which the parties negotiated and filed with the Court.

In full consideration of the facts of that case, the government requested a sentence of thirty months' incarceration, a sentence that fell at the high end of the agreed-upon Guidelines, specifically a range of 24 to 30 months. Judge Contreras sentenced Willden to twenty-four months incarceration. Because Council verbally assaulted police officers on the West Plaza before ascending to the NW Plaza and physically assaulted police *inside* the U.S. Capitol, the government believes that its recommended sentence of thirty months is sufficient but not greater than necessary to meet the statutorily mandated considerations and objectives.

## VII.   RESTITUTION

The parties made no agreement as to restitution since there was not plea agreement. However, consistent with other January 6 convicted felons, this Court should order Council to pay $2,000 in restitution, which reflects in part the role Council played in the riot on January 6. If so ordered, Council's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol.

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness

Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction.[32] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a

---

[32] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

"reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[33] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary

---

[33] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.[34]

Applying these principles to this case leads to the conclusion that Council should be required to pay $2,000 in restitution. One of the offenses to which he has pleaded guilty, 18 U.S.C. § 1752(a)(1), triggers mandatory restitution under the MVRA as an "offense against property" that resulted in pecuniary loss for the Architect of the Capitol, *see* 18 U.S.C. § 3663A(c)(1)(A)(ii). Moreover, Council's additional convictions under Title 18, *see* Count 1 (18 U.S.C. § 231(a)(3)); Count 2 (18 U.S.C. § 111(a)(1); Count 4 (18 U.S.C. § 1752(a)(2)), fall within the VWPA. As described in detail above, Council's conduct, in conjunction with that of many other rioters, directly and proximately resulted in damage to the Capitol building and grounds and losses suffered by law enforcement officers deployed to protect Members of Congress, their staff, and other Capitol employees. A "reasonable estimate," *Gushlak*, 728 F.3d at 196, of the restitution for which Council should be responsible is $2,000. That is the same amount that defendants convicted of felony offenses in connection with the events of January 6 have typically agreed to pay under their plea agreements.

The VWPA and MVRA also provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A)(requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each

---

[34] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. § 3663(a)(1)(B)(ii); 18 U.S.C. § 3663A(c)(3)(B).

victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h). Here, Council should be directed to pay $2,000 as an approximate estimate of the losses for which he is responsible.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of thirty months, which is a mid-range sentence as calculated by the government, restitution of $2,000, a fine, and the mandatory $300 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:

Sean P. Murphy
D.C. Bar No. 1187821
Assistant United States Attorney
Detailee, Capitol Siege Section
U.S. Attorney's Office—Dist. of Puerto Rico
Torre Chardon, Ste. 1201
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov